Good afternoon, Your Honors. May it please the Court, these cases concern sales of electricity at wholesale by government utilities in the California PX and ISO markets. In the orders under review, the Federal Energy Regulatory Commission asserted authority to order that the government utilities pay refunds under Section 206 of the Federal Power Act. The core of the case, and the arguments you will hear today, is statutory. Section 201B1 of the Federal Power Act, which introduces Part 2 of the Act, in part, says that the provisions of this Part shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy in interstate commerce. Then, in Section 201F, it says, no provision in this Part shall apply to, or be deemed to apply to, the United States, a state, or any political subdivision of a state, or their agencies or instrumentalities, or directly or indirectly owned corporations. It also says that these restrictions shall apply unless Part 2 makes specific reference to the government utilities. So the statute that we are talking about today does three things. First, it says that Part 2 shall not apply to government utilities. Second, it says that it shall not be deemed to apply, which is a rule of construction and a limitation on the interpretation of the statute by the government utilities, which is Congress's way of saying that if conditions in markets change, conditions in the industry change, Congress will reserve to itself the right to deal with those changes. And that is reflected in the statute quite clearly. The provisions of the statute that the FERC is applying here are Sections 205 and 206. Section 205, it may be helpful to the Court if it wants to follow this. FERC's brief at Appendix A4 and A5 set out the statute as it appears in the U.S. Code. But at any rate, returning to Section 205 and 206, Section 205, which requires that all rates of public utilities, all rates demanded by public utilities, the word demand appears and the word public utility appears, shall be just and reasonable and not unduly discriminatory. Section 206 gives FERC the power, the extraordinary power, to revise contracts of public utilities and their rates and charges, and in specified limited circumstances, to order public utilities to make refunds. The term public utility is essentially a form of jurisdictional shorthand enacted by Congress. It is defined in the Act as a person who owns or operates facilities subject to the jurisdiction of the Commission. The statute in turn, in Section 201B1, says the Commission's jurisdiction shall apply to facilities for the transmission or sale of electric energy in interstate commerce. And I think on those points that FERC is not in disagreement with you, as I read their brief, what the Commission has said is basically mirroring your language. We conclude that we don't have direct regulatory authority over power sales by non-public utilities, which dovetails the language of the statute you just read. And then the Commission goes on to say something to the effect, but because we have authority to regulate wholesale rates in interstate commerce, and because our regulation includes them as a player in this market, we're not directly regulating them. We're simply saying if you want to play in this pond, you have to abide by our rules. That, in effect, is a way to sidestep the language of the statute. But why isn't it one to which we should give deference, given FERC is an administrative agency? Well, I think, Your Honor, the answer is fairly straightforward. There is no way in which regulating the sales of the government utilities, when it says that it can change the sales contracts in certain markets. In every instance we deal with here, there is a sale by government utilities. And if it also says that the statute shall not apply or be deemed to apply to government utilities, there is no way, I think, logically, in which it can be said that changing the contract of sale, which is what's at issue here, under Section 206, is not an application of the requirements in Part 2 of the Act. Do you read that the remedy they invoke is one of an actual refund, as opposed to simply rejiggering the contract price? Do they also purport to order an actual refund? They do so because they are acting under Section 206 of the Act, which... And is there only authority for a refund under 206? Or is there also a 309 remedy there? There is... In order for a 309 remedy, Section 309 being the section of the Act that gives them general jurisdiction to enforce the provisions of the Act, they have to root it in some substantive provision. It doesn't stand by itself. The substantive provisions have to be Sections 205 and 309. If a public utility, for example, violates its tariff, the FERC acting under Sections 205 and 309 could impose a remedy for the tariff violation. These cases, however, concern the announcement on July 25, 2001, that the government utilities making sales into the California PX and the California ISO would be required to make refunds under Section 206. So this is not a case of the kind in which they are exercising a jurisdiction outside of Part 2. They are regulating sales. Hypothetically speaking, doesn't your construction allow public utilities, if they chose to, manipulate markets with impunity? In circumstances like the one we found in California, where it was structured the way it was in California during this period of time? You say public... You mean government utilities? Yes. I've used... Just as an aside before I answer your question, I'm using the term government utilities because it generally defines the class of petitions and petitions containers, and that is a Rural Electric Electrification Act entity. FERC has said in the record in this case, at joint excerpts of record 308 and note 62, that EPCO is treated like a government utility. All right. Government utilities. Government utilities. The answer is that there is no finding of any manipulation by government utilities. I'm speaking purely hypothetically. Speaking hypothetically. I guess the real question is... It would limit the remedies. What we are talking about are the remedies FERC can apply and no others. We're not talking about contract actions that might arise. Those are not before the court. We are talking about whether FERC can issue orders against government utilities based on Part 2 of the Act. And I think the answer to your Honor's question is as the Act is structured, FERC cannot and would not be able to itself directly remedy the alleged hypothetical manipulation you require. Your Honor's question illuminates the real issue here, I think, because the problem that has... I shouldn't say problem, but the history of the relationship between government utilities and investor-owned utilities in the electric utility industry in this country has been one of constant debate and tension going back to before the Water Power Act of 1920 when there was a struggle over how much government-owned dams should be allowed to sell. The argument has always been balanced on claims that it's not a level playing field. That is how it has gone. Congress in 1935 struck a particular balance when it enacted Parts 2 and 3 of the Federal Power Act. And that balance included this very categorical and plainly defined provision in Section 201F. But in doing that, it seems from the legislative history that given the time frame that nobody really contemplated these government utilities selling power in interstate commerce of the nature that we're confronted here today, would you agree with that? Not quite, Your Honor. And the reason is that the legislative history was enacted against a background of long debate about government utilities in interstate commerce. And historically, as we show in the petitioner and petitioner intervener's reply brief, there had already been substantial government utility sales in interstate commerce that were either contemplated or were occurring. If I may go back to a bit of history, in the mid-twenties, President Hoover vetoed a proposal to build dams at Muscle Shoals because he thought the government shouldn't be in the utility business. But two years later, in 1928, he approved the Boulder Dam Project Act, which contemplated interstate sales of electricity by government utilities. If I could discuss two questions together, is there anything that indicates that Congress intended to give government utilities license to manipulate the market or to obtain windfalls or to do things which the regulated utilities were plainly not permitted to do? Certainly, they didn't plan to grant an authorization to engage in any kind of behavior that is illegal under an applicable statute. But this was a question of what remedial lines the Congress chose to draw. By 1933, Congress had passed the Tennessee Valley Act, and then it enacted 201F in this statute treating federal government dams, federal government electric utilities, and state electric utilities, and local electric utilities all in the same way. So the answer to Judge McEwen's question, I think, is that this history clearly shows that Congress simply did not want to give the commissioners of the Federal Power Commission, now the FDRC, a jurisdiction over government utilities. I know it's very hard to actually say, no, there's no remedy here in the event there is market manipulation because it doesn't sit right. So my question is, in its arsenal of remedies, in your view, does FERC have any remedies available that wouldn't amount to regulation over the government utilities, but that would flow down as a matter of practice or reality to the government utilities? Well, you used the word any, Your Honor, which is, of course, very broad. Let me illustrate. Well, that's because I'm going to let you tell me if there are any. The answer might be none. So in contrast, any isn't so wrong. It isn't quite that categorical because, first of all, government utilities, when they sell power, they don't sell it under the Federal Power Act. They obviously make contracts to sell it. Every sale is a contract. So there has to be a contract remedy. But the question then becomes, what is the contract? And that's a question for another day, and I submit another court. The answer is that there may be contract remedies, and I wish I could say this in the subjunctive or the conditional. There may be contract remedies in some circumstances. Well, Salt River has argued, and I know you've read their brief, that FERC has the authority to order recalculation of the settlement statements, and therefore that would perhaps give rise to a contract remedy. Do you agree with their analysis? I think the position they take leaves open the question, as Your Honor put it correctly. Perhaps. The question would be whether the contract itself was one which, in effect, said if public utility parties to this contract have to make refunds, then so do the government sellers. And that remedy would be a contract remedy. I was going to illustrate it, if I may, with two cases that are much discussed in the briefs. The first is the Mid-Continent Area Power Pool case or MAP case, which was a decision by the FERC involving a power pool agreement to which both public utilities, subject to its jurisdiction, and non-public utilities, government utilities, were party. FERC found that a provision in the power pool agreement was not just unreasonable. It had been placed on file by the public utility members because it was, in effect for them, a rate schedule. It had to be filed. FERC, having found that a provision in this agreement was unduly discriminatory and that transactions had occurred while it was in effect, it ordered the public utility members to make refunds. But it expressly said, quite clearly, we, of course, have no jurisdiction to order the government utility members of this pool to make refunds. That is a matter for the courts to consider in analyzing the contract. And eventually the Eighth Circuit. And then it got to court. The Eighth Circuit had before it a district court's determination. The district court had examined the facts and examined the contract, reached the conclusion that the government utilities had agreed to pay refunds if the public utilities had to pay refunds. And it said we are not enforcing FERC's order for having no jurisdiction and having said it didn't have any. But instead we are enforcing the agreement. So if we're in between the lines, are you saying that you're conceding the theoretical possibility of another remedy but will probably contest that vigorously if you get to that point? You're absolutely right, Your Honor. The question will be what exactly the contract is. And that brings me to another aspect of FERC's inability, responding to Judge McEwen's question, FERC's ability to indirectly affect what a public, what a government utility may be doing. One of the cases that's very heavily relied on here is the decision involving the city of Vernon, which had in effect rented its utility, its transmission system to the ISO. That's a slight overstatement because what they did was transfer operation and control subject to being paid their so-called revenue requirement, the transmission revenue requirement. But that was essentially a form of rent. And the FERC looked at that rent and said, Now, wait a minute. The ISO is passing that cost on in its rates to transmission customers. We can look to see if that cost is imprudent, excessive, and we can modify it as it appears in the ISO's transmission rate. The city of Vernon went to the D.C. Circuit and said, We're exempt. We're under 201F. How can they do that to us? And the D.C. Circuit said to them, in effect, They're not regulating your transmission requirement. They're simply regulating the rates of the ISO and a cost component in the ISO's tariff rate. So there was a kind of an indirect effect there. There was a kind of an impact, but it certainly wasn't regulation of the transmission revenue requirement itself. It's a little bit like selling pencils to the ISO. The FERC could say, You've got an imprudent pencil cost in your rate. But they couldn't regulate the pencil providers. This is a sale that is like a pencil provider that is outside FERC's jurisdiction because the statute puts the sale outside FERC's jurisdiction. There's another case that is heavily relied on by FERC called United Distribution Companies, which involved FERC's very complex orders dealing with the unbundling of gas transportation from the gas commodity. And in that case, one of the conditions in FERC's orders that was under review was a provision relating to the release of transportation capacity, which was held by the customers of the pipeline, from one customer to another. In short, it was a substitution from one shipper to another shipper of the pipeline's jurisdictional capacity. That was regulated under the tariff of the pipelines, and the D.C. Circuit had no trouble in saying that that is clearly a transfer of a jurisdictional service that the pipeline is responsible for. Well, if you go back and unbundle that, you go back to the Natural Gas Act, it seemed that there were three things that could be regulated by FERC under the Gas Act or the predecessor to FERC. Transportation, wholesale pricing, and natural gas companies. And in some ways, other than natural gas companies, the first two of those essentially mirror what is available to FERC under the Federal Power Act. And going back to the Supreme Court's decision on which UDC is predicated, it seemed to me that the Supreme Court was saying, you could take each one of those phrases and each one can be an independent jurisdictional hook for the commission. And so even though the commission couldn't regulate what we'll call here government entity gas sellers, it said that they could sweep them in through that big jurisdiction of transportation. So the question then becomes, if you look at the partly mirror provisions of the two acts, why wouldn't the same rationale apply to the FPA where they can regulate the sale of electric energy and wholesale and interstate commerce? Well, let me turn to the Gas Act portion of that first because I think it again helps us understand what these limits are. The FERC's jurisdiction over transportation was a jurisdiction over transportation by natural gas companies. If we were dealing with a pipeline that was owned by a government utility, an interstate pipeline, I don't think there are any, but that's hypothesized. If we have a government utility owning a pipeline, that would not be subject to FERC's transportation jurisdiction, even if it was transportation and interstate commerce, for the same reasons that you have the exception in the Power Act. In the United Distribution case, what was being transferred was the pipelines, the natural gas companies' transportation capacity, hence the relationship to the FERC's jurisdiction over transportation. They had to share, so to speak, correct? They had a right to use it and they were a customer. These rights were sold and they were simply shippers and that's why the D.C. Circuit was very careful to use a phrase that I think is helpful in understanding that case because they emphasized that the status of the shipper didn't matter. What was being dealt with was the transportation capacity of a jurisdictional pipeline. Here, what is involved is the non-jurisdictional electricity being sold either to the ISO or to parties in the PX who are buying, but there's always a non-jurisdictional sale of what is owned by the government utility. So I come back to my comparison to UDC in which your Honor's hypothetical could be changed to say if the pipeline transportation capacity were on a government utility's pipeline, it would be unregulatable. It is when one shipper says to another shipper, I will substitute you on this jurisdictional pipeline. I will give you this capacity that the UDC case says, well, all you're doing is transferring jurisdictional capacity to begin with. Here, we have a non-jurisdictional sale to begin with and that is a principal part of the distinction on which we rely. We have a lot of non-jurisdictional sales. I think that's the curious part of this is that 30% of this particular market consisted of non-jurisdictional sales. So in the end, you have a FERC-controlled market that FERC really can't control, don't you? There's no doubt that there's a limitation on the ability of the FERC to control every sale in the market. That is the balance Congress struck. People say this is unfair. Why should we have a system like that? That's not right. I think the answer to be given is it's the balance Congress struck and what is equitable when Congress has struck a balance as far as reviewing the jurisdiction of a federal agency is concerned or reviewing is adhering to that balance. What is equitable is adhering to the statute that Congress, statutory lines that Congress drew. This question of equity is kind of an odd one when it's hard to say that equity is whatever the statute says it is. FERC says that one of its grounds for taking what I guess we'll call indirect jurisdiction, I'm not sure what the word would be, but indirect jurisdiction is equity. And my question is, is there any, does FERC have any basis to exercise equity other than what is given by statute? My answer is no. FERC is a federal agency, all of whose powers flow from the statute. If, I think we cite a case, the Atlantic City Electric case in our brief, if the statute doesn't give FERC the authority, FERC has none. And that's what we're talking about here. We're talking about FERC's authority. FERC is trying to read into the statute a kind of, into Section 201-F, a kind of prepositional exception that if you sell in a market, a particular market, or you sell into a particular buyer, that somehow the sale will become subject to its jurisdiction. Well, the statute is written in terms of sales and not purchases, by the way. And there are no such prepositional exceptions. The other arguments that are presented here include a suggestion that, well, somehow, since these utilities sold in these markets, they agreed to be subject to FERC's jurisdiction. FERC, incidentally, in its brief at page 42, says, no, no, they're not suggesting that. But there's other language in the brief and the orders which indicates that they're not suggesting that. But they are suggesting it. Without trying to sort out what FERC's position is, if we assume that there is an argument here that somehow there has either been a conferring of jurisdiction on FERC by agreement or a conferring of jurisdiction on FERC by waiver, then we run into the doctrine that federal agencies cannot acquire jurisdiction from private parties' agreements. That is simply not the law and cannot be the law. I talked about the Alliant and MAP cases and the City of Vernon case. I should also mention that FERC itself, in the New West case, which is cited in our brief, rejected an attempt by a government utilities subsidiary to get certification as a public utility. It said that it couldn't do that because Section 201F barred it from doing so. The statutory limitation is very, very strong. There's a misapprehension, I think, in FERC's orders that's very troubling. The bidders in the PX and ISO markets are not selling the services of the ISO and the PX to anybody. They are customers of the ISO and the PX. They are selling their own exempt power and that is sort of the key to our case. Now, if I can step to one other point, which is that, two other points very quickly. Assuming for argument that there were jurisdiction here, the first time that the government utilities heard about it was on, refund jurisdiction, was on July 25th, 2001, which was long after this proceeding began. Nothing in the complaint that originated the case filed by the San Diego Gas and Electric Company, and you'll find that at Petitioners of Supplemental Appendix, Supplemental Excerpts of Record, it's two and three, said anything about government utilities. And FERC went and issued... If the request by San Diego Gas and Electric had been granted to the order that was requested and the initial complaint had been granted, wouldn't that have affected the receipts of the government entities? It might have. If the market had been tapped, as SDG&E asked, since 70% of the sales that occurred before the... even assuming those that occurred are from public utilities, it's obvious that the clearing prices would have been tapped. So you really can't say that the complaint carved out government entities as being unaffected. They sought relief, which would have had an impact on government. The relief did, but the notice in the complaint, and the statute requires such a notice, made no mention of anything except jurisdictional utilities. The cap sought was a cap on the market-based rates of public utilities. FERC's own order on August 23rd makes that clear, uses the term jurisdictional sellers. And then when the commission actually addressed its own investigation, it again said it was initiating an investigation of public utilities. Finally, there's an inconsistency in FERC's treatment of out-of-market sales. Its argument here is that, well, they sold in this particular market, it's a centralized auction market, and then they turn around and say, but these out-of-market purchases by the ISO are also subject to our jurisdiction because they are pursuant to the ISO's tariff, which is like saying if you put a provision in your tariff that says that you are going to buy subject to FERC's jurisdiction, but somehow the jurisdiction gets conferred. The statute deals with sales, not purchases. So that is our basic position, Your Honors. I failed to take time for rebuttal. My colleague, Mr. Pennock, will address BPA and its specialty.  Mr. Pennock? May it please the Court, Mark Pennock, U.S. Department of Justice. I represent the Bonneville Power Administration in these appeals. Before you start, if Mr. Shapiro is correct, do you need to go any further? No. Okay. Go ahead. I just wanted to make sure that you were under his umbrella. Well, I will endorse right now what Mr. Shapiro said. It applies equally, and in all fairness, but to the Bonneville Power Administration. Bonneville is a federal agency within the meaning of Section 201-F. It is in exactly the same posture as the municipalities in that respect. It is also not a public utility. Under years and years of FERC precedent, it was treated as a non-public utility. For the first time in the history of Bonneville, FERC has come forward and said BPA is, in fact, a public utility. But that is not only contrary to the precedent, of FERC's own precedent, but it is contrary to precedent of this Court. Back in 1952, in the decision of California Electric Power, this Court observed that the, and I'll quote it to you, it's very short, for purposes of the Act, these public bodies, the ones enumerated in Section 201-F, are simply not deemed to be public utilities. Then it flows from the definition of public utilities in Section 201-E, which says, as Mr. Shapiro noted, that the public bodies, the FERC's jurisdiction, public utilities are those subject to FERC's jurisdiction. Section 201-F makes clear that governmental entities are not subject to FERC's jurisdiction. California Electric Power is perfectly valid today as it was in 1952. There is no room for argument here that BPA or any other municipalities are public utilities within the meaning of Section 205 and 206. FERC's assertion to the contrary should be decisively rejected. But BPA is in a unique position because BPA not only is a governmental agency subject within the meaning of 201-F, but it is, its rates, uniquely in this case, are governed by the Northwest Power Act. And under the Northwest Power Act, FERC's powers are very strictly limited. This is a comprehensive scheme under which the administrator of BPA sets the rates for BPA hearings conducted by BPA. Those hearings result in a proposed rate schedule, in this case, a rate schedule that was adopted by BPA in 1996. Then that is reviewed by FERC for purposes of these rates, at least, to statutory criteria. One, whether the rates are based on BPA's costs. And two, whether or not the rates are enough to ensure repayment of the federal investment. This Court has held, in the Central Lincoln case, in the Alcoa case, and in the Jura case, that this review by FERC does not include any inquiry as to the just and reasonableness of those rates. They are two entirely separate statutory schemes. One simply does not overlay the other, as FERC is attempting to do here. The statutory scheme on the Federal Power Act is very clear. And FERC actually approved BPA's rates, in this case, in 1997. A final approval. When that step plays, under 16 U.S.C. 839 F.E.4.D., which says, Rate determinations pursuant to 839 E., that's the ones involved here, of this title shall be deemed final upon confirmation and approval by the Federal Energy Party, by FERC. What we have here is a collateral tap on a final rate. We have here is an attempt by FERC and the California parties to superimpose a regulatory scheme which has Congress exempted BPA from, overall, on top of, to review the very same rates and rate structure that FERC approved in 1997. All without a shred of congressional authorization. This is truly remarkable when you think about it. In the 23 years I've been... We're dealing with market-based rates, which are fundamentally different than fixed-cost rates or cost-based rates. And market-based rates, if they're to be properly regulated, one has to take a retrospective view. Your Honor, FERC may regulate market-based rates under its Federal Power Act, but BPA does not sell under a market-based authority. BPA sells only under the authority and under the statutory criteria of the Northwest Power Act. No, I understand that, but I think as it emerges in the practical sense in this, it ends up in a essentially with FERC unable to control a market. Well, to the contrary, Your Honor. FERC's powers are those delineated by Congress over public utilities. As Your Honor has reflected, that's 70% of this market. That's a tremendous amount of control. And certainly to the extent that FERC capped this market when it issues its orders under Section 206, that affects everybody in that control of the market for BPA as well as everybody else. So FERC has ample powers to control this market. What we object to here is FERC's attempt to use the Federal Power Act which to override and control another federal agency's right to set its own rates, a right that had been established by Congress. I know you disagree with FERC's premise that it should be doing anything to BPA, but doesn't BPA in some ways stand in the same shoes as other government utilities whose rates are locally and state-based regulated as far as the rates, but then they sell into and purchase from the larger market which has now been regulated by FERC. So in that respect, isn't BPA just sort of on the same footing as your other governmental cohorts? With respect to my fellow municipalities or petitioners here, actually BPA is in a superior position in this sense because the rates set by the BPA administrator are subject to the criteria set forth in another statutory scheme, a very comprehensive statutory scheme that is on equal par, if you will, with the Federal Power Act. In my knowledge, there is no situation where Congress has ever permitted a federal agency to demand a refund, and we're talking about tens of millions of dollars from another federal agency, without express congressional approval. I mean, that's not true what we have here with respect to the other municipalities. There is no such express congressional approval. What we have here, what's expressed here is a denial of that jurisdictional right to FERC on both Section 201F and under the Northwest Power Act itself. It would be truly astonishing to say that FERC may exercise Federal Power Act jurisdiction over BPA where Congress has expressly denied it that power. That is, usurps the power of Congress and usurps the power of the President in Article 2 to allocate resources among the federal agencies. This is truly, I have no memory of this. The only time I can think of where Congress has actually allowed a power of one agency to control that of another, without judicial review, under the California Party's argument, is where EEOC has certain powers to command enforcement of Title 7 against federal agencies. Even under the Federal Labor Relations Act, agencies who are required to adhere to the orders of the Federal Relations Authority have a right to appeal. Although it's a completely different context, I find your argument somewhat ironic because in the last several BPA cases I've heard your colleagues always say, don't worry, FERC has review over this aspect of it. You know, this is premature. And FERC is the backstop for all of this. Different context, different statutory authority, not just the Power Act, this is the Federal Power Act. I don't know what particular cases you are, but certainly BPA's position consistently has been that FERC's position in terms of its review of our right to set our rates is very strictly limited. That was the position that BPA pushed in Central Lincoln and Olicoa and Jura. And this Court agreed that BPA may not exercise rate control by setting rates under a just and reasonable standard. It may not impose the requirements or supersede the Northwest Power Act by imposing the requirements of the Federal Power Act. The two are entirely separate. To now allow FERC on a particular market to say, well, you know, they sell into this market so we're going to hit them anyhow, is to elevate FERC's ad hoc interpretation in the face of congressional limitations imposed not only by the Federal Power Act, but by the Northwest Power Act itself. It becomes... Is there any reason to think that Congress intended BPA to be uniquely free to retain a windfall or to manipulate the market? The same questions posed before for municipalities. Or is this simply an accident of what has happened with the power market in the years since these acts were initially enacted? Well, Your Honor, there's every reason to believe that Congress did not intend that FERC exercise any jurisdiction over BPA. The review allowed by Congress was that set forth in the Northwest Power Act. The whole idea of that was to give the administrators enormous amount of discretion in setting the rates of BPA so that these rates could be quickly implemented. The whole idea was to limit judicial review and limit oversight. Indeed, FERC's... Congress was aware of the Federal Power Act and expressly told BPA not to use it. It's a... Whether it's a windfall or whether it's not a windfall is immaterial because FERC doesn't have the authority to say, we have to act in the interest of equity to extend our power over other federal agencies, which, in fact, we have never been given that power by Congress. Law supersedes equity, no matter what. Equity doesn't create statutory authorization. Thank you, Your Honor. Thank you, Your Honor. Mr. Lang? What FERC did here was set revised clearing prices in the single-price auction market that it created, that it modified, and that was administered by the ISO and PX, both of which are FERC jurisdictional public utilities. There's no stepping beyond our bounds. There's no stepping beyond This was clearly within our bounds because we reset a price that we always had authority to regulate. But in resetting the price, did you order the governmental utilities to refund? To effectuate that policy, we require them. It's a little bit hard to say because, actually, nothing has really taken place yet in terms of money. I know that money isn't flowing. Right. But in practical terms, you've ordered a refund. They will have to offset their purchase price with any reduction resulting from our order. So, if you want to call that a refund, yes. I'm not trying to evade the term refund. Right, because we can't evade the term refund. That's the difficulty here. I don't think we can just say we've reset a price, therefore, FERC is within its jurisdiction. What we have to examine is whether there is, in fact, a refund ordered under 206 and whether FERC has the authority to issue that order vis-à-vis the governmental entities. So, maybe you could clarify for me if you think that are you saying that simply resetting the market clearing price somehow permits you to avoid making the 206 analysis? No, I'm not saying that at all. What I'm saying is in these specific circumstances, we had a situation that was not envisioned by Congress when it passed the Federal Power Act that there's nothing in the legislative history that suggests at all that somehow governmental entities should be shielded from regulation by the Commission. In fact, if you look at the history that we provided in the committee reports, it was indicated that the reason for the exemption was to protect public utilities from having to, for example, expand their services or interconnect with private utilities and their, excuse me, with governmental entities and thereby the governmental entities would gain an advantage. So, from our perspective, we don't see the statute as being as clear as petitioners do. We see it as being ambiguous. Let me go. No, go ahead. There's a difference between the legislative history informing this and then doing the statutory analysis. So, let me just start with the statute. It says, no part of this subchapter, which is subchapter two, shall apply to, and then I guess we're using the short-term governmental utilities, unless the provision makes specific reference thereto. The question I have is, why under current Supreme Court jurisprudence, we would even look to the legislative history? Why wouldn't we simply first see if that statute isn't quite clear? Well, that's the reason that I started off by saying that what we did was revise the prices in a market that we regulate, because from our standpoint, the conflict, if you will, within the statute is between the two sections, 201B and 201F. And if we have jurisdiction over the wholesale sales here, how do we reconcile that with the exemption? And that's where we see the problem or the ambiguity existing, rather than just looking at the statute, individual sections in isolation without taking the whole statute together. Well, what I would wonder, under that line of reasoning, what good would 201F be? Because if you have wholesale authority, so to speak, over the wholesale market, and in your view, that can trump 201F, then what meaning at all does 201F have? Well, recall that the Commission said almost innumerable times, but very many times, that we are only applying this in the specific circumstances of this case. The Commission has not attempted in any other situation to take jurisdiction over governmental entities. It just happened to be in this particular situation where we had the single price auction so that whatever the highest price was... I understand the rationale, and I think everyone is sympathetic to it given the unintended consequences of what occurred in the California energy crisis. But under the rationale of the Commission, it's hard for me to distinguish between this circumstance and the next one that might come along. In other words, what's the principled dividing line for purposes of jurisdiction? And then how do you give life to 201F? I think the principled dividing line, and that will answer your question, is that where there is... the only situation where this has been applied is where there's a single price auction where the same price applies to all sellers so that you have, in effect, the 30% of sellers automatically receiving the same price in a situation where the Commission has determined that that price is unjust and unreasonable, that it applies in that situation. We don't... There's no other situation to which it has ever been applied besides that. I don't know any other dividing line. That's the dividing line. In a way, it's kind of circular. The dividing line is this situation. Well, we never... We've never been in the situation... The Commission has never been in the situation where we've had a single price auction where the same price applied until this time. Previously, all the other contracts, and continuing on, have been bilateral contracts. Why does that make any difference in terms of jurisdiction? Well, because the Commission views that as a situation where the seller and the buyer individually enter into an agreement and that, because of 201F, is exempt from our regulation. But in the situation here, we created the auction market, in effect. We approved it. Part of that approval was that the price would be just and reasonable, and that is a difference from a bilateral situation. You're not... When you're going... When the governmental entities were going into this market, they didn't know for certain who was going to be their buyer. They did not interact directly with that buyer. They went in, in the ISO or the PX, when the PX was running, established the price and set up the sale. What that sounds like is we created the market, which caused the difficulty, and therefore we created our own jurisdictional exit, I guess, in this case, or additional jurisdiction. And somehow I'm having trouble linking that up with the statute. In other words, FERC created the situation, and therefore FERC can take jurisdiction. Something about that logic just doesn't sit right in light of congressional specificity. So if you create another market that is also subject to manipulation, rigging, and various other things, does that mean then FERC could say, well, we created this. It didn't work out. And the only way we can correct it is to take jurisdiction where we previously had none. That seems to be the logic, unless I'm missing something. Well, I think... I guess there's several answers to that. But the one that I would turn to first would be that is the same situation that I think you'll find when you read the UDC case. In effect, the commission created the capacity release program. And there was no problem in the capacity release program. So it doesn't have to be a situation that we create a program that doesn't work. We thought that the California program would work, and in fact it worked very well for a couple of years before things went south. So it isn't the fact that we see problems and therefore we assert jurisdiction. It's that we created the program. And if you're going to be in our program, as the D.C. Circuit said in UDC, all sellers must abide by our rules. But of course, there's several differences with the UDC case. One is that the Gas Act doesn't have a 201F. And even though government entities aren't subject in general to the Gas Act by virtue of, I guess, judicial and historical convention, you don't have a legislative prescription. And you weren't ordering something that was legislatively prescripted in the D.C. case, were they? That's incorrect. Remember, in UDC, there were two distinct types of entities. Local distribution companies, or LDCs, and municipals. Municipals, if you go... I don't have the Act here, but if you parse through it, you will see that municipals are not included. There's no way that you can get... They're like government utilities, what we're calling government utilities. They're like a 201F exemption. But there is no legislative prescription equivalent that says, unless otherwise the provision makes specific reference like a 201F, right? No. Okay. No, from that point, but from the point of view of the court in that case, I think municipals stand in exactly the same position in that the court considered them to be exempt from the Act. So I would look at it from that aspect. As you get down to it, though, which you're claiming that you're... the authority that you have, and I don't think that's much disputed, is you can reset the rate. What is disputed is whether or not then that becomes, for the government utilities, a question of contract law or FERC jurisdictional remedies. And I think that's the point of the divide. Now, the FERC orders here, actually, as I read them, ordered the refund. It created a FERC remedy as opposed to saying, well, we're resetting the rate and let's let each party is free to pursue their contract remedies. Isn't that the exercise of FERC jurisdiction that's critical here and unprecedented? It's... I think you're correct. In fact, that is the proper question here. The... I mean, if FERC had only said, we're resetting the rates, I don't think we'd be here today. Would we? Well, obviously. We'd be in a different case. At least not with this part of the case. I'm sure we'd be with a whole bunch of other parts of the case, but... So you did much more than that. Pardon me? You did much more than just simply reset the rates in your order, or FERC did. Right. When we effectuated those rates, what we said was, look, this is our market. Implicit in our market, if you will, is that the rates cannot be above a just and reasonable level. When you came into this market, you knew that FERC controlled that market, that we had established it, that it was subject to our regulations, and you knew that the rates could not be any higher than a just and reasonable level because that's what our statutory mandate is. When you put all those things together, what the Commission was saying was, look, just because you're a governmental entity doesn't put you outside of that. You were subject to the same condition, and part of that condition is that you can get no more than just and reasonable level, and if that requires you to make refunds, so be it. Well, let me stop there, though, because we keep saying the same thing, but I'm having trouble getting to the bottom of the authority. Don't the governmental utilities participate in, they've also participated in markets that wouldn't necessarily be a single-price auction market, correct? Correct. And in those markets also, FERC regulates reasonable and just rates, correct? Correct. Well, not in those particular situations. I don't know what you mean by those markets. To the extent that FERC has the authority to determine what's a just and reasonable rate, it can issue, subject to its jurisdiction, it can issue refund orders, correct? Correct. So why couldn't FERC do this in other circumstances other than the single-option circumstance? What would prevent it from exercising jurisdiction there on a parallel analysis? Do we open the box and basically say, once FERC is regulating wholesale rates, as long as you choose to play in that market, then you play by their complete authority? No, I don't think so at all. I think the difference is because in all those other markets, there are really no FERC jurisdictional sales because they're all bilateral contracts. And in this situation, I'm sorry to keep coming back to the same point, but it's a single-price auction and that is run by the ISO and PX. The difference between if you and I contract is... Well, I understand the difference between a bilateral contract and a pooling contract, but that is a factual difference, not a jurisdictional difference, it seems to me. No, I think the Commission views it as a jurisdictional difference in the sense that the only way the ISO PX markets could run were subject to our regulation and ergo subject to the Federal Power Act. And in the other situation where you have bilateral contracts, you don't have the same degree of regulation  Is that the distinction you're drawing between the circumstance and MAPs? The difference between MAP and this case was that MAP did not run a market in the way the ISO and PX ran a market. It didn't run the market at all. In that situation, each of the individual MAP members had their separate tariffs so that if you were going from here to there, you would have, let's just say, five different tariffs that you might have to enter to get your power from one side to the other. And say three of those were jurisdictional and three of those were governmental entities. The Commission never regulated the governmental entity tariffs in MAP because there was no central market. So what the Commission did, and maybe this helps out to answer your question, that it went through and parsed each of those agreements and said, look, the three that are for jurisdictional public utilities, we have the authority to regulate, and the other, there was only one, but in my hypothetical there are two, governmental entity tariffs, we did not regulate those. That's a different situation, again, from a single-price auction market where, unlike MAP, the ISO and PX were actually running the market. Well, you know, one of the questions that comes up is, obviously, from first perspective, you want us to first determine that it's unclear and therefore we would then go into our Chevron analysis, correct? Certainly. Okay. But if we went into Chevron analysis and we were trying to figure this out... I should say, I don't want to not give you the opportunity... To say that it's absolutely clear. But I thought I heard you say it wasn't clear, so I was taking you at your word, but it's true that the easiest way for you to win is for us to say it's clear you can do this and stop. But if that didn't work out, and if we were forced into Chevron, I want to explore from the Commission's perspective what we ought to be looking at. One thing that is of interest here is that both sides say that, you know, there's various kind of calculus made by Congress in terms of what they want FERC to do and what they don't want FERC to do. But as recently as the early 90s, and before that in the late 70s, Congress rewrote parts of the Federal Power Act under PURPA and actually defined, I think, electric utilities to include what we call municipal utilities. So my question is, if we're looking at the reasonableness of this and wondering, well, maybe Congress didn't quite have it in its mind in 1935, who could have imagined the California energy crisis in 1935? Because the fact is that they have amended the Act since then, and they've had the opportunity to kind of set things right in terms of how the utility market has evolved. Shouldn't we give some credence to the fact that they could have amended this many times and they've still left that strong prohibition in there? Obviously, I don't think so, because it was before the restructuring occurred. Again, I'm coming back to the repeated references in the Commission's orders that it was in the specific circumstances presented here, and restructuring in California did not occur until 1996. And I think with Congress, I think in general, you can say that as bad as we are with market-based rates and retroactively regulating them, Congress is even further behind us many times. I mean, it wouldn't be amazing or surprising, but it's not necessarily ordinary that Congress is ahead of the curve on saying, oh, gee, well, California is going to have restructuring in four or five years. I guess maybe we'd better rewrite the act to allow governmental entities, because we know they're going to be 30% of this market and it's going to be a single-price auction market. I just don't think... But let's say we're in Chevron land, and so we then have to reconcile the ability to regulate wholesale rates with 201F and 206, which would say, but you can't regulate them with respect to these guys. How, under Chevron, would you make that analysis? Well, I would say the first thing that you should look at is what is the fundamental purpose of the Federal Power Act, which is the protection of consumers against exploitation. Starting from that basis, I would then go through the provisions and I would see if there was... Let's not say conflict, but let's say there's some disagreement or you could read provisions one of two different ways. I would say read it to... That's the first thing that you should look at is what is the fundamental purpose of the Federal Power Act. And how would you, if you had to write it up, how would you write up Section 201F as having more than one meaning that would comport with your structure? Because that's what you're asking us to do. Sure. I'm going to ask you to do it first. I'm only smiling because I think the Commission did that and it's the situation that I've said several times and I say that the Commission said many times, was that in these specific circumstances, the way to read the Act is to fulfill that purpose. Draw the line there and that preserves... Remember, there are a whole bunch of other things that you have to have... We have accounting rules, we have reporting rules, we have rate filing rules that governmental entities are not being asked to do as a result of this. We are not regulating any of their other sales, their bilateral sales. So that's how I think the Commission tried to write it up and that's how I would respectfully suggest that you at least consider writing it the same way. As you look at Chevron, we get to that point in the Chevron analysis on whether FERC's actions were reasonable. You look at the history of FERC and there has been a historic difference between the way that FERC has looked at investor-owned utilities and government utilities and also a historic difference between the way it's looked at regulating tariffs and non-regulating contracts. And it seems to me that really this is quite a departure from both the tradition and history of each. I don't disagree at all and I'll just point you to this Court's opinion in the California Power Exchange case where the Commission in that case, we eliminated an entire tariff. We had never done that in the history of the Federal Power Act and PX came in and said you can't do that. It's the same thing. Look at the history. And we said we have to do that. That is the only way that we can stop what we saw one of the key structural problems in the market. And so this Court said it may be unprecedented but that doesn't mean you shouldn't do it in the situation when it's presented to you. Remember, and we've said this in our brief, that the Federal Power Act didn't end in 1935. Its interpretation is ongoing. It's a dynamic act. As situations change, the act has to change and the Commission's regulation has to change to fit it. And that's what we're trying to do here as well. Let me switch gears for a second. If, in fact, it turned out that FERC didn't have the kind of jurisdiction that it asserted here, do you agree that there is an alternate remedy, an effective alternate remedy in terms of contracts or not? I know you reject hypotheticals. No, no. The thing that amuses me is Salt River on page 6 of the brief admits it doesn't have one of these contracts. So clearly it will never be under that. There was some self-interest there. Sure. I think the battle will be long, hard, and well fought on both sides in what will be the outcome part. Remember, one of the things that the Commission has been maybe excoriated is too strong a word, but remember, we started with structural changes prospectively and then we went back to refunds. We were challenged on that. We're being challenged now because we're taking too long on these refunds. The refund case isn't finished. If we go through all that and then we have to go through contracts that may not result in anything, quite frankly, maybe there is some remedy at some point in the future, but I'm not holding my breath. Unless you have any other questions, maybe I could save it for tomorrow. Thank you. Mr. Robertson. Good afternoon, Your Honors, and may it please the Court. My name is Richard Robertson. I'm appearing on behalf of the California parties. The high prices and the market manipulation that California suffered during the California power crisis caused devastating harm to the people of California, its businesses, and to the utilities that served them. This harm resulted from the actions of all of the sellers in the market, which charged excessive rates, and many of which, including public entities, to engage in acts of market manipulation. The issue that's presented here this afternoon is whether a public entity that brings itself to a market is subject to the market's rules. The public entities argue that they can sell under the terms of a per-jurisdictional tariff but not be bound by the tariff's rules, not its pricing rules, not its rules against market manipulation. And this, Your Honors, is the fundamental flaw in the public entity's argument. All of their rights to payment for sales in the ISO and PX markets derive from the ISO and PX tariffs. They have no separate arrangements under which they can claim any rights to payment of amounts higher than are permitted under the ISO and PX tariffs. However, the ISO and PX serve as clearinghouses in which buyers and sellers choose to come to the market and agree to be bound by the terms of those market rules. There's been a lot of talk about the statute, but it's the public entity's position that violates the statute. If public entities are permitted to charge more than the tariffs permit, then the customers will be charged unlawful rates under the ISO and the PX tariffs. This would not only subject California to prices under tariffs that violate the FERC regulates that violate the FPA, it would also make it impossible to have a centralized clearinghouse market anywhere in the country that includes public entities because you would have a large percentage of the market that would be exempt from the very rules that the market operates under. Now, section 201F does not in any way undermine FERC's ability to take the action it's taken, and this is so for three reasons. First, what FERC is regulating is the rates in the ISO and PX tariffs. The public entities chose to accept those rates, and they therefore waive the right to claim that the rates in the tariffs don't apply to them. As I said, they have no separate rate schedule, no separate contract they can point to that would permit them to charge anything else. Having agreed to sell at rates that FERC regulates, they can claim no right to be paid more than FERC permits. Second, Your Honor, public entities are subject to FERC's jurisdiction, where FERC is enforcing jurisdictional rate schedules. For example, FERC has ordered municipalities to pay surcharges to utilities where it corrects prior orders. In the follow-up to the UDC case, FERC has issued orders requiring non-jurisdictional entities to show cause why they should not have to pay refunds for charging more than the maximum amount permitted under capacity release programs, and FERC has even ordered refunds in one circumstance. Has FERC ordered refunds under 206 against a government utility? And in what case would we look to? Your Honor, the case I don't believe has ever presented itself. Okay. But what FERC is ordering here is not that the public entities pay refunds under Section 206. What FERC is ordering is that the prices in the ISO and PX tariff be set to just and reasonable levels. I have to stop there because it seemed to me we got onto this a little bit before about whether they were resetting the market price, and that's why I asked Mr. Lane, and as I heard him, he said, yes, they're resetting the market price, but the effect of the FERC order is to order a refund. I agree with that characterization. Okay. So instead of trying to back away from that because that's what the order says, I think that you need to square how FERC can take that remedy against a governmental utility. Your Honor, FERC's authority to enforce the terms of rate schedules, to enforce against any party who doesn't comply with the rate schedule, flows not only from Part 2 of the Federal Power Act, but also from Part 3. Section 309 of the Federal Power Act empowers FERC to issue orders to do all things necessary and appropriate to fulfill its jurisdiction. But Section 309 is not under Subpart 2, correct? Yes, Your Honor, and that's a key distinction. Okay. Well, and the key distinction is that as I understand Subpart, or Subchapter, I guess they call it, Subchapter 2 is what 201 specifically refers to. In other words, this restriction on the government entities is limited to Subchapter 2. So if you go into Section 309, we don't have the same limitation, correct? Precisely, Your Honor. So that would – but this particular remedy that FERC is ordering here is not a 309 remedy, is it? Well, Your Honor – I think that's tomorrow. I believe that it is. Okay, why is that? If FERC is ruling under Section 206, is that the rates of the ISO and the PX, which are public utilities, are unjust and unreasonable, and it's ordering that they be changed. The public entities have agreed to abide by all of the terms of the ISO and PX tariffs. As I said, they have no other rate schedule to sell under. FERC's authority to enforce rate schedules, and it has long issued orders that require municipalities to take actions where their parties to rate schedules. FERC's authority to enforce rate schedules against all buyers and all sellers under those rate schedules is contained in Section 309 and is contained in Part 3 or some Chapter 3. It appears differently in different versions of the Act. But as I understand it, and maybe you'll have to sort this out with FERC, but the remedies that might be available under 309 are different than those that might be available under 206B, correct? Yes, Your Honor. Okay, so it seems to me that we're not arguing Section 309 here in terms of jurisdiction, at least it's briefed. What we're arguing is whether there is authority under 206B. Your Honor, the authority under 206B relates to the public utilities themselves that in this case sit in the middle of the market and act as a clearinghouse into which all sellers sell under the rules of that market and all buyers buy, and the clearinghouses serve the function of paying the sellers the sum total of what it collects from the buyers and vice versa. FERC's authority, FERC's duty, is to ensure that the prices charged in the ISO and PF market, public utility markets subject to FERC-filed rate schedules, meet the requirements of the Federal Power Act. It has done that here. Once it is determined what the rates must be in accordance with Section 206B under this filed tariff, the next step is how does it enforce those obligations as against all the parties? If there are buyers that under this resettlement process the ISO is conducting under FERC's order might owe more money, might have to give money back to the market if there are sellers that may have to pay additional money, what's FERC's authority to enforce the rate schedule as it has modified it under Section 206? And I would contend that their authority to enforce a rate schedule to implement their jurisdiction, which they clearly have over the ISO and PF tariffs in 206B, is through Section 309. That's the authority to issue orders. Do you have any authority for that construction of the statute? Yes. The courts have held under Section 309 that it provides FERC with the authority to issue orders to implement the matters under which it regulates in the Act. That's contained in the legislative history of the Act and it's also explained in more detail in a case from the D.C. Circuit from nearly 40 years ago called Niagara-Mohawk v. Federal Power Commission. Did that involve a governmental utility? I don't believe that it did, Your Honor. Do you have any case that says that you can proceed under 206 against a governmental utility despite Section 201 so long as you do it under the rubric of 309? Your Honor, this circumstance presents a situation that hasn't arisen before. But it's FERC's obligation under 206 to ensure that the rates in the ISO and PF tariff were just and reasonable. And it needs authority, therefore, to reach all parties in the market to do that. And in the past, it has exercised authority over municipalities. It's ordered them to pay surcharges. It's ordered them to provide refunds in this capacity release context. It has ordered them to pay charges under contracts that they dispute. It has general authority to implement filed rate schedules. And that general authority stems from its general administrative authority. It's not under Section 206 that it orders a party to abide by the terms of its rate schedule. Section 206 provides the Commission with the authority to modify rate schedules that are found to be unjust and unreasonable. Its authority to enforce filed rate schedules comes from Part 3 of the Federal Power Act. And if I may, Your Honor, there's a third reason that 201F should not apply here. If the Court perceives that there is a tension between Section 201F and the requirements of Section 206 and 309, the Court should tell it that the SPA must be construed in accordance with its purpose. And its purpose is to protect consumers. So if there is perceived to be a tension, then that tension must be resolved in a way that permits PERC to eliminate unjust and unreasonable rates from being collected under PERC jurisdictional tariffs. Your Honor, the Court asked a number of questions as to what the line is. If the Court were to find, in this case, that PERC can enforce the tariffs against public entities that agree to accept its terms, then what does that leave of 201F? Your Honor, as we see it, the reason that the public entities are obligated to abide by the terms of the tariffs, as they may be changed by PERC, is because they chose to transact under the tariffs. They came to the market and they sold under the PERC rate schedules, agreeing to accept whatever price those rate schedules produce. This leaves them with the same alternative they've always had. They can sell to any investor-owned utility in the western United States. They can sell to any market in the western United States. They can sell to any other public entity. And, of course, they can sell to their own native oil customers. The only circumstance under which they would be subject to a ruling such as the one at issue here, is where they choose to sell at rates that are recovered through a PERC jurisdictional tariff, because PERC regulates that tariff and must ensure that all rates charged under it are just and reasonable. Are there other circumstances where there would be a PERC-regulated tariff that they may be in the market in, in which there might be an unreasonable rate, and they also would then also be subject to PERC jurisdiction in that case? There are other ISO markets elsewhere in the country. But the key fact is that they must have brought themselves to the market and agreed to sell not under a separate rate schedule of their own choosing, but under the terms of the tariff itself, under the terms of the PERC jurisdictional tariff. Let me ask you this. They couldn't sell into this market except under this circumstance, correct? Under this tariff? They could not have the ISO and PX recover their charges through this tariff except through this tariff. They could have sold to others in the market through mechanisms outside of the ISO and PX markets. There's nothing that would have prevented them from doing that. And, Your Honor, on that point, if I may like to make one additional point. If the counsel for the agency focused a lot on the single clearing price auction, there were other purchases that were made by the ISO that the Commission has also found were at excessive prices. These involve what are sometimes called out-of-market. But what out-of-market means is that this is power, that the ISO is authorized to purchase under its tariff when it gets to the last minute and it doesn't have enough power offered to it in the auction markets in order to protect reliability. This is the power most susceptible to gain and manipulation. It's often at the highest price. And that is likewise subject to refund in this case because the sales were made through the ISO clearinghouse market and are being recovered through this tariff. So what you're saying is it's not really the nature of the market structure alone that gives the jurisdiction. In other words, because there's variations on the theme that make up the market as a whole, instead you go back to the public interest and the other issues that you articulated. It's not the market itself that defines the jurisdiction. Is that a fair statement of your position? Your Honor, I see my time has expired. May I answer? Please. Thank you. What provides FERC with the authority to do what it did was the action by the public entities in selling under the terms of a FERC jurisdictional tariff. And that's the same whether the rates are set by auction or otherwise. In the UDC case, those transactions aren't priced by auction. They're priced bilaterally with offers placed on an electronic bulletin board and parties buying particular services and paying particular releasing sellers including municipalities for them. But nonetheless, it was the central role of the FERC jurisdictional pipeline that provided FERC with the authority to set maximum prices and if necessary refunds for sales that are made into that market. It's not the auction that's critical. It's the recovery of prices through a central clearinghouse that FERC regulates. Thank you, Your Honor. Thank you, Mr. Robinson. Mr. Shapiro? Yes, we'll give you five minutes. First, I think it's important to put Chevron in perspective since it has been so stressed both by the Commission and by its supporters. I think when one thinks of approaching Chevron, one also has to keep in mind the rule of Brown and Williamson, the tobacco case in which the FDA, for very good public interest reasons, sought to exercise a jurisdiction that Congress had denied it. And I think that case guides our approach to Chevron. One cannot simply say we want to protect the public. The Supreme Court said you can't protect the public beyond the point that Congress indicated it would stop. One thing that Brown and Williamson did was to elaborate on Chevron and say you have to look at the structure of the act as well as the plain words. And in this case, I guess the argument may be that 309 expands on the 206 remedies and gives perhaps FERC a hook if we were to hold that 309 remedies were available and proceeding that might provide some jurisdiction over your clients. Addressing the 309 remedy, the most important point I have to make is that FERC's actions here were not based on 309 but on 206. The orders do not rest on 309. And the second point I think I should make is that Section 309 is a grant that must always be exercised in terms of a related substantive authority granted in the act. So it has to come back to Part 2 in this instance, and of course Part 2 is not applicable. The statement was made that public power entities were among the manipulators of this market. FERC has been conducting three types of proceedings here. One is the California refund proceeding. The second was its effort to establish prospective remedies that would control the market and it struggled with that until the remedies it adopted in June of 2001 proved effective. And the third is individual investigations on a fairly massive scale of entities alleged to have violated terms of tariffs or manipulated. Those investigations have not found that public power entities were engaged in such conduct. Finally, I'd like to say... May I just ask a point of clarification? Would FERC have the authority to conduct such an investigation vis-à-vis specifically a governmental utility? We have contested it. FERC has gone ahead with it anyway. Whichever lawsuit, you know. Yes, we do. They have, however, gone ahead and they have terminated investigations on the ground that they haven't found anything. They are arguing that our challenges are moot.  Well, what the ISO market is and what the PX market was is a third-party market mechanism in which a price is set, in which a transaction's rules are set. FERC always has the power prospectively to revise those rules and whatever those rules are, that kicks in a contract. What we're talking about here is FERC's power to revise the contract. If I can use a simple illustration, let's suppose that public utility... Government Utility A... I'm glad you made that distinction, too. I started off on that. Government Utility A wanted to sell electric power to Public Utility B. They couldn't agree on price and terms, so they went to their much-admired Public Utility C and asked them, Public Utility C, set the price. And Public Utility C did. They signed a contract. There would be no jurisdiction over that contract. Now, the Commission says, well, that's a bilateral contract, and here the buyers and sellers didn't interact together. That's not the point of the statute. The statute is that if there is a sale by a government utility under Part... It is not subject to Part 2. That brings us back to the essence of the statute and I think concludes the basic argument that the government utilities wish to submit. Thank you. In case a disturb will be submitted, Mr. Panik, I know you have some things probably to say, but you're under Mr. Shapiro's umbrella and we're in fairness to the other side. We'll let you rest on that. Okay, thanks. I want to thank especially the judges and the staff of the Southern District of California for providing this facility and allowing us the courtesy of using their courtroom. I want to thank Cole Benson, who's here, who's done fantastic work on this case as always, extraordinary work, and Lisa Evans as well. An enormous amount of time and effort over the past year and we greatly appreciate it as well. Now, for council tomorrow, we do have an announcement as to parking. You can correct me if I get this wrong, Wendy. The south lot adjacent to the Kroc Institute will be reserved for the judges, court staff, and council. Now, that lot may be reached by entering the University of San Diego at the west entrance at the bottom of Loma Vista Road. Follow the sign to the stop sign at the top of the hill. The Institute will be over to your right shoulder on the southwest corner. Turn right and proceed to the next stop sign. The Institute's on your right. I'm sure you're all getting this now. Turn right at the stop sign. Go slightly downhill, keeping to your right. Enter the parking lot on the south side of the Institute building. Park in any available space and walk around the building, from the building and enter through the main doors. Because you've kept all of these complicated aspects of this case in your head, I know. You can keep those directions in your head. And I want to also extend my thanks to Rob Wagner for coming down here from Pasadena and to Judge McKeon and her staff for doing such a superb job of organizing that. With that, we'll be in recess. All rise. This court, this session, is adjourned.
judges: Thomas, McKeown, Clifton